**United States District Court**
**Southern District of New York**

| | |
|---|---|
| Sarah Teague, D.C.; Robert Avila d/b/a Constantine Creations; and Machelle Schomaker d/b/a Thing-A-Ma-Jigs, on behalf of themselves and all others similarly situated, | Case No. _____ |
| **Plaintiffs,** | |
| vs. | **Class Action Complaint** |
| Lease Finance Group, LLC; Northern Leasing Systems, Inc.; Lease Source -- LSI, LLC; Lease Source Inc.; MBF Leasing LLC; Jay Cohen; Leonard Mezei; Sara Krieger; Encore Payment Systems, LLC; Merchant Services, Inc.; Universal Merchant Services LLC; Jason Moore; Trans Tech Merchant Group, | Demand For Jury Trial |
| **Defendants.** | |

## Introduction

1.      This is a nationwide class action seeking compensatory damages, restitution, disgorgement, and injunctive relief arising from a fraudulent scheme involving merchant credit card services and leasing of credit card swiping machines.   Merchant card services enable businesses to accept and process credit card payments; such businesses typically also need to lease or buy the swiping machines.  Defendants, who offer such services and such leases, engage in a range of fraudulent practices, including:  willfully orchestrating false representations about potential savings in transaction costs; fraudulently altering signed contracts purportedly entered into by businesses for such services; wrongfully taking unauthorized fees and other charges from bank accounts belonging to such businesses; charging exorbitant and unconscionable rates for leasing of credit card swiping machines; and failing to notify customers of their practices.

2.     Plaintiffs, for themselves and all others similarly situated ("Class Members"), bring this action pursuant to Ohio Consumer Sales Practices Act (Ohio R.C. §§ 1345.01 *et seq.*), California Business & Professions Code ("Cal. Bus. & Prof. Code") § 17200 (California "Unfair Competition Law" or "UCL"), Oklahoma Consumer Protection Act 15 O.S. Supp. 1991 secs. 751 et seq., and other state consumer statutes for unlawful, unfair or fraudulent business acts or practices, and also pursuant to Cal. Bus. & Prof. Code § 17500 (California "False Advertising Law" or "FAL") for unfair, deceptive, untrue, or misleading advertising. Plaintiffs also seek relief for common law fraud, deceit and misrepresentation, negligent misrepresentation, conversion, breach of contract, and unjust enrichment.

## Jurisdiction And Venue

3.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, as codified at 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant, there are more than 100 class members nationwide; the aggregate amount in controversy exceeds $5,000,000; and minimal diversity exists.

4.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## Parties

**Plaintiffs**

5.     Plaintiff Sarah Teague, D.C. ("Teague"), an individual consumer, is a chiropractor.  She maintains her office in Beavercreek, Ohio, where she has operated her chiropractic practice at all times alleged in this Complaint. Teague asserts her claims in this Complaint individually and on behalf of all others similarly situated against Defendants Lease

Finance Group, LLC; Northern Leasing Systems, Inc.; Lease Source – LSI, LLC; Lease Source Inc.; Jay Cohen; Leonard Mezei; Sara Krieger; and Encore Payment Systems, LLC.

6.      Plaintiff Robert Avila ("Avila"), an individual consumer, owns and runs a small business known as Constantine Creations.  Avila has maintained and operated that business in Covina, California, at all times alleged in this Complaint.  Avila asserts his claims in this Complaint individually and on behalf of all others similarly situated against Defendants Lease Finance Group, LLC; Northern Leasing Systems, Inc.; Lease Source – LSI, LLC; Lease Source Inc.; MBF Leasing LLC; Jay Cohen; Leonard Mezei; Sara Krieger; Merchant Services, Inc.; Universal Merchant Services LLC; and Jason Moore.

7.      Plaintiff Machelle Schomaker ("Schomaker"), an individual consumer, owns and runs a small business known as Thing-A-Ma-Jigs.  Schomaker has maintained and operated that business as a Sole Proprietorship in Oklahoma, at all times alleged in this Complaint. Schomaker asserts her claims in this Complaint individually and on behalf of all others similarly situated against Defendants Lease Finance Group, LLC; Northern Leasing Systems, Inc.; Lease Source – LSI, LLC; Lease Source Inc.; Jay Cohen; Leonard Mezei; Sara Krieger; and Trans Tech Merchant Group.

**Defendants**

8.      Defendant Lease Finance Group, LLC ("LFG") is a Delaware company with its principal place of business at 132 West 31st Street, New York, New York.  LFG is engaged in the equipment lease financing business.

9.      Defendant Northern Leasing Systems, Inc. ("NLS") is a New York corporation with its principal place of business at 132 West 31st Street, New York, New York.  NLS is ostensibly engaged in the equipment lease financing business and upon information and belief is

3

the umbrella organization, affiliate and/or alter ego of LFG and many other shell entities that conduct leasing operations at the same address with the same forms, same staff and same modus operandii as NLS.

10.    Lease Source-LSI, LLC and Lease Source Inc. (collectively, "LSI") is a "pass through" entity for NLS, and is also ostensibly engaged in the same business at the same address with the same forms, same staff and same modus operandii as NLS.

11.    MBF Leasing LLC ("MBF") is a "pass through" entity for NLS, and is also ostensibly engaged in the same business at the same address with the same forms, same staff and same modus operandii as NLS.

12.    Defendant Jay Cohen is the President and Chief Executive Officer of NLS, and an officer of LFG. Cohen is one of the masterminds of the enterprise which is the subject of this action. Cohen is also an officer of MBF.

13.    Defendant Leonard Mezei is the Chairman of the Board of NLS and is also an officer of LFG. Mezei is also an officer of MBF.

14.    Defendant Sara Krieger is the Vice President for Operations of NLS and MBF.

15.    Defendants Cohen, Mezei, and Krieger, direct and control NLS, LFG, LSI, MBF and various shell entities as more fully described below. (Together, NLS, LFG, LSI, MBF, Cohen, Mezei, and Kreiger are referred to herein as the "Lease Finance Defendants.") Cohen, Mezei, and Krieger worked in concert to cause NLS, LFG, LSI, MBF, and the shell entities to engage in the conduct described in this complaint. In particular, the individual Defendants each directed NLS, LFG, LSI, MBF, and the shell entities to maintain continuous and systematic contacts with other members of the scheme and further directed the NLS, LFG, LSI, MBF, shell entities, and certain other members of the scheme as more fully described below, to consummate

the unlawful transactions described herein with Class Members, to unlawfully deduct monies from Class Members' accounts, and to attempt to enforce unlawful contractual provisions against Class Members. Cohen, Mezei, and Krieger have all profited personally from those activities.

16.     Defendant Encore Payment Systems, LLC ("Encore") is a business entity with its principal place of business at 3801 Arapaho Road, Addison, Texas. Encore is a provider of merchant card services; such providers are also referred to in the industry as "Independent Service Organizations" or "ISOs."

17.     Defendant Merchant Services Inc. is a corporation with its principal place of business at 9012 Research Drive, Suite 200, Irvine, California. Merchant Services Inc. is an ISO and, upon information and belief, is the affiliate, alter ego, and umbrella organization of numerous other businesses that also are ISOs and which operate from the same address and use the same staff as Merchant Services Inc.

18.     Defendant Merchant Services Inc. also operates under the name and/or does business as Defendant Universal Merchant Services LLC ("Universal"). Defendant Universal shares the principal place of business of 9012 Research Drive, Suite 200, Irvine, California, with Defendant Merchant Services Inc. On information and belief, Defendant Merchant Services Inc. is the affiliate, alter ego, and umbrella organization of Universal. Universal is an ISO.

19.     Defendant Jason Moore is the President, Chief Executive Officer, and majority shareholder of Defendants Merchant Services Inc. and Universal. Defendant Moore directs and controls numerous shell entities as further described below. These shell entities are used to perpetrate the fraud described herein. Defendant Moore or one or more of the shell companies he directs and controls owns the property located at 9012 Research Drive, the principal place of business for Merchant Services Inc. and Universal.

20.     Defendant Trans Tech Merchant Group ("TMG") is a business entity holding itself out as having business addresses at 100 Throckmorton Street, Suite 1800, Fort Worth, Texas and/or 3220 Keller Springs Road, Suite 128, Carrollton, Texas.  TMG is a provider of merchant card services, also referred to in the industry as "Independent Service Organizations" or "ISOs."

21.     Encore, Merchant Services Inc., Universal, and TMG, are among the ISOs with whom the Lease Finance Defendants have conspired to carry out the fraudulent scheme described herein.  (Collectively, Encore, Merchant Services Inc., Universal, Moore, TMG are referred to herein as the "ISO Defendants.")

## Facts Pertaining to All Claims

**Overview**

22.     Defendants are engaged in a nationwide scheme to defraud small business owners in connection with the provision of electronic payment processing services, including the processing of debit and credit card transactions, and the leasing of the swiping machines. Operating through over 100 shell entities (the "Shell Entities") from the same offices with the same staff and same modus operandi, the Lease Finance Defendants pay substantial commissions to their agents, including the ISO Defendants, to obtain, by any means, Class Members' signatures on a standard form application/contract ("Form Lease"). To obtain that signature, Defendants falsely promise low transaction fees for their processing services.  After the applicant has signed the Form Lease, Defendants alter the contract by adding pages that were never shown to the applicants and by filling in blank areas with new terms. These newly added pages and terms include purported provisions for early termination fees, liquidated damages, liability limitations, arbitration clauses, and choice-of-law and choice-of-forum provisions. Sometimes,

6

Defendants go so far as to forge the initials or signatures of small business owners on the newly added pages or filled in areas.

23.     The altered contracts contain unconscionable provisions, including long-term leases that require small business owner to pay wildly inflated monthly rental fees for credit card processing terminals and inflated early-termination fees, and require small business owners to personally guarantee the contracts.  The contracts also authorize Defendants to debit payments purportedly due under the agreements directly from the customer's bank account.

24.     Once Class Members' signatures are obtained (or fraudulently inserted through electronic or written forgery), Defendants electronically debit Class Members' bank accounts for the higher-than-disclosed processing rates, inflated rental fees, and other unauthorized charges. Defendants' inflated or unauthorized withdrawals include: (a) over-charges for property taxes, where Defendants pocket the difference between what was charged and what Defendants paid; (b) an undisclosed $25 "filing fee" for property tax returns in connection with such property tax payments; and (c)  charges of $4.95 per month per piece of leased equipment towards an "LDW" ("loss damage waiver") program, which program purports to provide insurance coverage for the "leased equipment," but is in fact illusory.

**Lease Financing and Independent Sales Organizations**

25.     Defendants are involved in various aspects of the market for electronic payment processing services, which involves several different players, often working together to defraud small business owners.  The Lease Finance Defendants supply financing for the leasing of these electronic point-of-sale equipment, typically credit card swiping machines.  The Lease Finance Defendants conspire with providers of payment processing services, the ISOs, to defraud small business owners.  The ISO Defendants are among the ISOs who are part of the scheme.

26.     In order to accomplish their fraudulent scheme, the Lease Finance Defendants have established relationships with ISOs all over the United States.  The ISOs act as agents for the Lease Finance Defendants and provide the sales force necessary to effectuate the scheme orchestrated by the Lease Finance Defendants.

27.     Sales agents working for the ISOs and in furtherance of the scheme, approach merchants who use or want to accept credit cards from customers.  The sales agent sells both, the ISO's processing services and the Lease Finance Defendants' leasing services, in what appears to the small business owner to be a single, undivided transaction.  Lease of the equipment through the Lease Finance Defendants is presented by the sales agent as a requirement for obtaining the ISO's processing service.

28.     The sales agents are instructed and trained systematically to make false representations about potential savings, transaction costs, leasing costs, and similar aspects. Indeed, some ISOs, as a means of inducing individuals or merchants to sign up for services, tell merchants and small businesses that they have qualified for a "free trial" of a debit/credit card machine contingent only upon submission of an application to try the machine and without further obligation.  Merchants were instructed to submit a "voided" copy of a check with their application so that the ISO would know where payments for debit/credit cards could be deposited.   These promotions, along with other false representations, are used to induce merchants to enter into the fraudulent lease arrangements offered by Defendants.

29.     The leases offered by the Lease Finance Defendant are exorbitantly inflated and unconscionable.  The Lease Finance Defendants lease credit card swiping machines with a fair market value between $200 and $400 dollars if purchased outright for lease payments between $100 and $200 dollars *per month over a period of 48 months*, so that small business owners end

up having to pay between $4,800 and $9,600 for these credit card swiping machines. And even after this huge payment, the small business owners don't own these credit card swiping machines. Instead, the leases renew automatically unless lessees affirmatively terminate it after the lease term and return the leased item, or pay another exorbitant "buyout" sum. Most often, small business owners are not even aware of this requirement which is buried deep into the legalistic, single-spaced multipage form lease.

30.     The Lease Finance Defendants get small business owners to agree to these exorbitant rates by having the sales agent make false promises of huge savings on the monthly cost of the ISO's processing services, so that the net cost to the merchant is made to appear lower than the cost of processing services offered by competitors. The ISOs profit because the cost savings are illusory; in reality, through a variety of techniques described below, the ISO charges the merchant substantially more than the sales agent represents. In addition, the Lease Finance Defendants share the exorbitant profits from the lease with the ISO, in effect paying the ISO to assist them in selling the unconscionable lease to the merchant.

31.     In a legitimate lease transaction, the lessor's ability to inflate the lease payments is usually limited by value of the equipment as security for the lease. If the lessee defaults on the lease, the lessor will want to be able to repossess the equipment and offset its loss. Where the lease calls for payments totaling more than 20 times the value of the equipment, however, repossession provides no remedy if the lessee defaults. The Lease Finance Defendants are able to circumvent this limit on their ability to offer exorbitantly inflated leases by requiring merchants *personally* to guarantee the lease payments. Having secured this personal guarantee, the Lease Finance Defendants are free to set any payment amount they choose, with no

relationship to the value of the equipment being leased, so long as the sales agent can get the small business owner's signatures on the leases by hook or by crook.

32.     Nor are the Lease Finance Defendants content with the rewards of their unconscionably priced leases, sold through fraudulent representations about the cost of processing services offered by their partners-in-fraud, the ISOs.  As part of the process of entering into the lease, merchants are required to provide information sufficient to allow the Lease Finance Defendants to debit lease payments automatically from the merchant's bank account.   The Lease Finance Defendants then use this information to withdraw additional amounts of money from merchants' accounts beyond the already-inflated cost of the lease.   The Lease Finance Defendants claim that these payments represent additional fees authorized by the leases the merchants have signed, but in many cases, these fees are contained on pages not shown to the merchant, but rather fraudulently added to the lease after the merchant has already signed, or even on pages on which the merchant's signature has been forged.   Even where fees may be authorized, the Lease Finance Defendants often withdraw more money from the merchant's bank account than the amount they may legitimately be authorized to charge for a particular fee or service.

33.     For their part, the ISOs, including the ISO Defendants, use these same techniques to charge more for their services than the discounted prices used to induce merchants to sign up in the first place.   Just as the Lease Finance Defendants obtain banking information and authorization to debit a merchant's bank account directly, so too the ISOs obtain this information to cover the monthly processing fees.   They, too, then debit the bank account for amounts in excess of the rates promised to the merchants.   Again, these additional fees may be contained on pages of the processing agreement that were never shown to the merchant and only added to the

agreement by the ISO after the merchant has already signed.   The ISOs, including the ISO Defendants, sometimes even forge the merchant's signature on such additional pages.   They also withdraw amounts in excess of the amounts authorized and often continue to debit the merchant's bank account after the agreement has been terminated.

34.   By the time the merchant realizes that the amounts being debited from the bank account are in excess of the amounts represented, it is too late.   Defendants tell the merchant that the agreements cannot be cancelled. They continue to debit the merchant's bank account for unauthorized amounts and unconscionable lease payments.

**The Conspiracy**

35.   Defendants have conspired with one another and with other unscrupulous ISOs and agents to defraud consumers and small businesses and hide profits earned through their fraudulent criminal activities.

36.   At all times herein mentioned, each of the Defendants was the agent, servant, representative, officer, director, partner or employee of the other Defendants and, in doing the things herein alleged, was acting within the scope and course of his/her/its authority as such agent, servant, representative, officer, director, partner or employee, and with the permission and consent of each Defendant.

37.   At all times herein mentioned, Defendants, and each of them, were members of, and engaged in, a joint venture, partnership and common conspiracy, and acting within the course and scope of, and in pursuance of, said joint venture, partnership and common conspiracy.

38.   At all times herein mentioned, the acts and omissions of Defendants, and each of them, contributed to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

11

39.     At all times herein mentioned, Defendants, and each of them, ratified each and every act or omission complained of herein. At all times herein mentioned, the Defendants, and each of them, aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages, and other injuries, as herein alleged.

40.     The ISO Defendants participate in the conspiracy as the direct point of contact with Class Members. The ISO Defendants induce Class Members to sign up for equipment leasing and credit/debit processing services in furtherance of the conspiracy. The ISO Defendants employ inducements such as false discounted pricing for services only to later debit Class Members' accounts for inflated charges and fees to which Class Members did not agree or which were not included in the form agreements ISO Defendants induced Class Members to sign.

41.     NLS, LFG, LSI, MBF and the Shell Entities operate under the direction of Jay Cohen and Leonard Mezei, who manage the operations of these entities and manage their participation in the conspiracy. Defendants Cohen and Mezei oversee the operations of NLS, LFG, LSI, MBF and the Shell Entities, making key decisions to further the fraud and increase the profits of NLS, LFG, LSI, MBF and the Shell Entities. Cohen and Mezei orchestrate and execute the overall scheme to defraud Class Members, including but not limited to holding the Shell Entities out as separate businesses, even though their true intent was to use the shell companies to confuse and mislead victims and the courts.

42.     Defendants Cohen and Mezei know that the leases enforced by NLS, LFG, LSI, MBF and the Shell Entities had been obtained through fraud, forgery, and deceit, and have structured the Shell Entities to further that fraud and ensure that victims who are harmed cannot be adequately compensated.

43.     Defendant Sara Krieger participates in the conspiracy and ensures its success by soliciting new ISOs and executing the fraudulent lease agreements. Defendant Krieger knows or reasonably should know that these leases have been forged or obtained through fraud and deceit, but approves them to increase her own personal profit and the profits of the NLS, LFG, LSI, MBF and the Shell Entities.

**The Deceptive Form Lease**

44.     The first page of the Form Lease appears to be a complete document.  It contains all the material information normally associated with such transactions (name, address, amount, equipment information, term, bank information) and signature blocks for both parties; however, that first page contains nothing incorporating the remaining three pages, or even alerting Class Members to the existence of additional pages that may be part of the Form Lease.  The first page of the Form Lease contains the following statement which appears in a box under the caption "Lease Acceptance", which box also contains the space for Class Members' signature:

> Lessee has read and agrees to all terms and conditions contained in this Equipment Finance Lease.

45.     That "Lease Acceptance" box is followed by two other boxes on the same page. One box provides for Class Members' personal guaranty, and the other is for signature of acceptance by Defendants.  Thus, the first page effectively conveys that the Form Lease is a one page document.  Class Members are routinely led to believe that the Form Lease is comprised of just that one page, which belief was actively fostered by Defendants' agents at the time of lease-signing.

46.     In fine print at the bottom of that page, tucked away in its far left corner is an inscription which reads "page 1 of 4".  The placement and size of the print, which is difficult to

read even if noticed, is obviously a part of Defendants' scheme and does nothing to enable Class Members to detect or inquire about additional terms. Thus, when Class Members complain about not ever having been aware of the existence of the additional three pages, Defendants routinely rely on this buried fine print, disclaim their agents' misrepresentations, and blame Class Members for allegedly not having read the buried fine print and/or not having conducted an in-depth investigation on their own.

**Failure to Provide Copies of the Form Lease to Class Members At Time of Lease Signing**

47.    Consistent with this unlawful scheme, Defendants' agents never discuss, mention, or even refer to the remaining three pages of the Form Lease, and do not leave copies of the Form Lease with Class Members at the time of signing. Instead, Class Members are simply told that a copy will be mailed to them. By that time, of course, Defendants assert that the Form Lease has allegedly become "irrevocable" and non-cancelable for the entire term, usually 48 months.

48.    Moreover, even when Defendants belatedly send copies of the Form Lease, i.e., after it has allegedly been accepted and become irrevocable, such copies are made at reduced size (2 pages reduced to 1). Thereby, the already unreadable, legalistic terms are rendered even more difficult to read or understand by Class Members. As a result, it is often months before Class Members even know of all the terms of the Form Lease.

**Concealment of Material Facts**

49.    As set forth above, Defendants' agents deceptively induce Class Members, with affirmative misrepresentations and concealment of material facts, to sign the Form Lease. Defendants then disown these fraudulent inducements, and claim that the Form Lease represents an irrevocable commitment for overpriced items at onerous terms. Unknown to Class Members

at the time of signing, the leased equipment items are typically available in the market for outright purchase, free and clear, at a small fraction of the price Defendants charge over the term of the lease.

50.     Defendants routinely disclaim all their agents' representations made at Form Lease inception, and point to the merger clause of the Form lease as justification for attempts to enforce the onerous and unconscionable terms of the remaining, unseen pages of the Form Lease. In fact, an integral part of Defendants' fraudulent scheme is the active concealment from Class Members of the harsh terms of the three undisclosed pages of the Form Lease, which includes provisions that purport to:

    a. entitle Defendants to charge sums significantly higher than those specified in the first page of the Form Lease;

    b. allow for automatic electronic deductions from Class Members' bank accounts;

    c. continue indefinitely Class Members' other Form Lease obligations unless Class Members gave a specific advance 30 day notice of cancellation, with a buyout balloon payment, at the end of the specified term;

    d. immunize Defendants from any warranties for the equipment;

    e. shield Defendants from answering for any failure or malfunction of the equipment even though Defendants retain title to the leased equipment;

    f. make absolute and non-cancelable the Class Member's obligation to pay Defendants;

    g. impose upon Class Members an insurance obligation to Defendants with respect to the equipment leased;

h.   allow Defendants, in the event of an alleged default, "without demand or legal process [to] enter into the premises where the equipment may be found" and repossess or disable the equipment;

i.   impose charges for late payment of monthly dues an extortionate 15%, with a minimum of five dollars;

j.   impose upon Class Members, in the event of litigation, a one-way obligation to pay Defendants:

    i.   Attorneys' fees up to $1,500;

    ii.   "Reasonable attorneys' fees" for recovering possession of the equipment;

    iii.   Costs of the suit;

    iv.   $250 towards "internal collection overhead;"

    v.   $225 towards "internal repossession and remarketing overhead"; and

    vi.   All "other" expenses.

k.   add a provision that any litigation would be venued in New York or such other place where the "holder of lessor's interest" - i.e., Defendants or any of their 100 shell-entities  - "maintains its principal office for administrating this lease."  In other words, the forum would be (and most commonly was) far away from Class Members' homes and businesses.   Furthermore, the chosen forum could be changed by Defendants at any time by simply transferring the Form Lease to one of their affiliates registered - or to be registered - elsewhere.   Moreover, Defendants -- but not Class Members - may effect service of process for a legal proceeding by certified mail, return receipt requested.

1. Further, the form lease contains a clause providing for waiver of trial by jury. Such a predispute waiver is void under the law of certain states such as California, *Grafton Partners L.P. v. Superior Court*, 36 Cal.4th 944, 956, 116 P.3d 479, **485 (Cal. 2005)

**Defendants' Abuses Regarding Class Members Who Object or Default**

51.     In the event of default by lessees, Defendants routinely proceed against the Class Member guarantors personally.   Indeed, Defendants promptly proceed to disparage the guarantor's personal credit, and damage the guarantor's consumer credit score, by repeatedly pulling his/her personal credit report, and by making inaccurate and adverse credit entries in disregard of federal and state credit reporting statutes.   Defendants manufacture these adverse entries in the guarantor's personal credit report even before they commence legal proceedings against the primary obligor. Such adverse entries end up costing Class Members dearly, sometimes up to tens of thousands of dollars.

52.     Defendants' approach to collection is aggressive.   They use the undisclosed provisions of the Form Lease described above to obtain payment, dunning Class Members with collection letters, harassing them with endless phone calls to every phone number (home, , business, cell) that Defendants can get, threatening to disparage and actually disparaging their personal credit reports, and obtaining default judgments against those who still refuse to pay.

53.     In these dunning phone calls, Defendants' representatives expressly and routinely tell Class Members that it would be more expensive for such Class Members to litigate Defendants' claims in New York than it would be to pay off Defendants.   And when Class Members do not succumb to this threat, Defendants hound them with repetitive and abusive phone calls, in an attempt to brow beat Class Members and interfere with their personal or

business operations.  Defendants' representatives annoy and intimidate Class Members in this manner at home, at work, and at any other telephone number for such Class Members that Defendants can find.

54.     When Defendants commence legal proceedings, Class Members rarely have the opportunity to raise any defenses.  Defendants regularly file their collection suits in New York, despite the fact that most of the Class Members reside in far away states.  Few if any can afford the expense of litigation in a distant forum, and even Class Members who do obtain counsel are hampered by the undisclosed Form Lease provisions.  Given the amounts in controversy, it is financially burdensome and impractical for Class Members to gather evidence and put on potential witnesses in their defense, because they are most often located in Class Members' home states, far from the New York City Civil Court.

**Defendants' Fraudulent Charges**

55.     Defendants routinely charge amounts in excess of those in the Form Leases and/or amounts which are not even disclosed in the Form Lease.

*Loss Damage Waiver*

56.     First, Defendants routinely charge a fee of $4.95 per month per piece of equipment leased for a "loss & damage waiver" ("LDW").  This fee is assessed upon all lessees who purportedly do not provide proof of insurance.  Defendants' Form Lease typically provides on the undisclosed third page of the Form Lease (of which most Class Members are unaware) that an unspecified amount would be assessed towards LDW.  The Form Lease does not disclose how often the LDW would be charged, and further authorizes Defendants to change that unspecified amount at any time without any notice.

18

57.     The Form Lease conditions this levy of LDW charge upon a Class Member's failure to provide proof of insurance to Defendants prior to lease commencement, which is, in turn, conditioned upon Defendants' request for such proof; but Defendants routinely do not request proof of insurance coverage from Class Members, thereby ensuring that Class Members remain unaware of the LDW charge or the need to provide proof of insurance to avoid the charge at lease inception.

58.     Also undisclosed to Class Members is that Defendants' LDW "program" has a deductible of $200.   As Defendants are well aware, the replacement cost of the equipment covered is far below this deductible.   In sum, the purported "LDW Program" is a ruse for Defendants to collect money, since the $200 deductible will always be more than the replacement cost of the leased equipment.

*Property Taxes*

59.     Second, Defendants overcharge lessees for property taxes, routinely collecting from Class Members amounts greater than the taxes actually paid by Defendants to taxing authorities.

60.     Upon information and belief, Defendants initially used "acquisition cost" as the property tax basis for leased equipment, defined as Defendants' cost of acquiring the lease. Defendants soon shifted to a value for the property tax basis that was almost universally much lower that the acquisition cost[1], while nevertheless continuing to collect from Class Members at the much higher tax level, while retaining the difference in furtherance of the scheme.

---

[1]Defendants' acquisition cost  was what Defendants paid the ISO, which included incredibly high sales commissions.  Thus, this acquisition cost was significantly higher than the actual market price of the swiping machine.

*Filing Fees*

61.     Third, in addition to the property taxes, Defendants charged Class Members a filing fee of $25 per property tax payment.  The existence, amount, and frequency of this filing fee is concealed from Class Members by Defendants, who levy it capriciously, even though Defendants were well aware that the filing fee was not authorized by the Form Leases.

**Plaintiff Teague's Transactions**

62.     In April 2002, Teague called her bank to request a debit and/or credit card processor for use in connection with her chiropractic practice.  The bank sent a representative with a machine.  Teague told the representative that she could agree to a 2-year lease for the machine, to which the representative agreed.

63.     The debit/credit card machine Teague leased allowed her to accept debit and credit cards at her business.   When the charges were processed, Encore was to pay the amounts charged, less a per-transaction processing fee, by depositing the money owed directly into Teague's bank account.  Lease payments for the equipment would be withdrawn directly from the bank account as well.

64.     Thereafter, NLS began making deductions from Teague's bank accounts.

65.     In 2006, the Encore sales representative suggested that Teague upgrade her machine.  Teague did so and signed a new lease, which was in the name of LSI.  Thereafter, both NLS and LSI regularly executed automatic deductions from Teague's bank account.  Teague was not aware that she was being billed for two machines.

66.     In 2009, Teague spoke with Encore to advise that she had found a cheaper processing arrangement and that she wished to discontinue her existing arrangement with Encore

and LSI. Encore told Teague that she had another four months on her lease. After four months, Teague sent the equipment back to LSI, which accepted the equipment without objection.

67.     In September 2009, Teague began receiving harassing phone calls and dunning letters from LSI. LSI's September 24, 2009 letter, in particular, asserted that Teague had "a non-cancelable lease agreement" with LSI, specifying no date on which that supposed agreement would end. Teague called LSI and spoke with a representative. The LSI representative told Teague that she should send the machine back and that if Teague simply paid for one additional month of service there would be no further obligations. Teague sent LSI a money order for $29.34, along with a cover letter confirming that the equipment had been returned and that there should be no further billings. Teague also closed her bank account in order to stop additional deductions.

68.     In May 2010, for the first time, LSI faxed to Teague a copy of the lease supposedly signed by her. The lease purported to be six pages long, although Teague had signed only a one-page lease. Teague's signature and initials had been forged in multiple places on the latter five pages of the purported lease. The purported lease contained terms, as described above, which were onerous and one-sided, to which Teague had not agreed and did not agree, of which Teague had not been apprised, and to which she would not have agreed had she been apprised.

69.     From January 2003 to August 2009, Teague was charged $6,038.51. LSI has threatened to initiate a lawsuit against Teague to enforce the terms of the lease Teague supposedly entered into.

70.     LSI has made an adverse entry on Teague's credit report.

**Plaintiff Avila's Transactions**

71.    Plaintiff Avila is a member of a business group called Business Network International.  A woman named "Lisa" joined Business Network International and, as a new member, asked Avila if he would meet with her to discuss reducing his credit card transaction rates.  He agreed.  "Lisa" met with Avila's bookkeeper and, ostensibly, reviewed Avila's credit card processing machine and the amounts he was paying.  "Lisa" was a sales representative for Defendant Universal.

72.    Several days later, "Lisa" told Avila that she could offer him a machine and processing services that would amount to a total cost of $60 to $80 per month.  She did not mention an additional monthly payment of $200.  "Lisa" told Avila that his processing machine had to be replaced because it was about to become obsolete.  Avila signed what he understood to be an application for the services.  "Lisa" did not provide him with a copy of the application, but told him that after her boss signed it, she would hand-deliver it to him.

73.    Several days later, a machine was delivered and "Lisa" instructed Avila to begin using it.  As Avila understood the arrangement, the debit/credit card machine being offered would allow him to accept debit and credit cards at his business.  When the charges were processed, Universal would pay Avila the amounts charged, less a per-transaction processing fee, by depositing the money owed directly into Avila's bank account.

74.    By letter dated January 10, 2008, MBF informed Avila that on January 11, 2008 (the following day), MBF would be charging him a property tax and filing fees in the amount of $91.09, which purportedly included a $25 filing fee.

75.    By letter dated September 17, 2008, MBF informed Avila that on September 29, 2008, MBF would be charging him property tax and filing fees of $89.71, which purportedly included a $25 filing fee.

76.    In 2009, Avila discovered that he had paid over $5,000 for the credit card processing machine.  He immediately issued stop payment instructions to his bank.

77.    Thereafter, MBF for the first time sent Avila the purported four-page lease agreement.  This was the first time Avila saw a four-page document.  It plainly had not been filled out by him:  his zip code was wrong; his business "Start Date" was referenced as 1999, when in fact he had been in business for more than 25 years; and the phone number on the lease was not even close to his actual phone number.  The purported lease contained terms, as described above, which were onerous and one-sided, to which Avila had not agreed and did not agree, of which Avila had not been apprised, and to which he would not have agreed had he been apprised.

78.    The purported four-page equipment finance lease reflected that Avila was to be charged $189.99 per month for four years to lease the processing equipment – a rate he never would have agreed to given that the equipment was separately available for less than $300 total.  Upon reviewing his accounts, the monthly payment MBF withdrew was actually $210.61 – even more than the amount specified in the purported lease.

79.    MBF began sending dunning letters to Avila.  In November 2009, MBF was able to deduct a significant amount from Avila's account.  Upon inquiry, Avila's bank informed him that his stop payment order was effective only as to specific withdrawal amounts.  So, when MBF's ACH deductions were rejected, MBF simply changed the amount, whereupon the

deduction went through notwithstanding the stop payment. Thereafter, Avila closed the account and MBF was unable to deduct any additional money.

80.     MBF is now threatening to sue Avila. Avila has received dunning letters dated June 10, 2009; June 26, 2009; July 20, 2009; September 17, 2009; September 18, 2009; November 14, 2009; November 23, 2009; December 7, 2009; February 18, 2010; May 3, 2010 (threatening an adverse credit report); May 3, 2010 (demanding return of equipment "to avoid further expenses"); May 3, 2010 (regarding payment); May 18, 2010; September 15, 2010 (regarding a "final notice"); and two letters dated November 2, 2010.

81.     In addition, Avila received an invoice dated June 18, 2009 and a "cancel fee" communication dated November 13, 2009, which included an ACH return fee of $45. On June 15, 2011, Mr. Avila received a fax from MBF demanding return of the processing machine. Avila has returned the machine and has been using his old machine which, in 2007, "Lisa" of Universal had told him was "about to become obsolete."

**Plaintiff Schomaker's Transactions**

82.     In August, 2009, Schomaker was preparing to open her small business. A business acquaintance suggested that she consider a credit card machine for business transactions. The acquaintance gave Schomaker the business card of Trans Tech Merchant Group. Schomaker contacted Curtis Weir from TMG and set up an appointment.

83.     On August 14, 2009, Schomaker met with Weir to learn about TMG's services. Weir led Schomaker to believe that she was signing an application for a one-year service agreement with TMG. During the meeting, Weir claimed to be sick and in a hurry to get the transaction completed. He had "pre-marked" the application for Plaintiff's signatures in appropriate places. Weir filled out Schomaker's business information on the document. He

paraphrased the terms of the application and wrote on the document before, during, and after Schomaker signed as he requested.

84.    Weir informed Schomaker that the use of the credit card machine was a part of the TMG service agreement application which she was signing.  He did not indicate that there was any business distinction between TMG and LFG.  Schomaker believed, and Weir led her to believe, that she could call TMG to cancel the agreement at any time if it was not working for her business.  Weir took a cancelled check from Schomaker's business bank account so that TMG could begin making automatic deductions.

85.    In September 2009, both TMG and LFG began making ACH deductions from Schomaker's bank account.  TMG took $5.00 per month and LFG began taking $49.09 per month.  There was no indication that the deductions were going to two separate companies and Ms. Schomaker still was not aware that LFG was not the same as TMG.  Ms. Schomaker believed all deductions were originated by and in favor of TMG.

86.    Ms. Schomaker set up the credit card swiping machine in October 2009 and made a couple of test transactions.  The machine was never used again.

87.    Ms. Schomaker decided that the credit card machine was not a good fit for her business.  She boxed the machine up for return.  In December 2009, Ms. Schomaker called TMG to cancel the service.  She asked to what address she should return the equipment, expecting that she could cancel her agreement with TMG at any time.  She was shocked to learn that she was locked into a 3-year contract and that there would be fees including a $495.00 cancellation fee, $3.00 per month for transaction fees, and additional fees.  None of these terms had been disclosed to her when she signed what she believed was merely an application for services.  She asked for the address to return the equipment and was told that she could not return same.

88.     Defendants continued to deduct funds from Ms. Schomaker's bank account.

89.     On January 26, 2010, Ms. Schomaker's husband requested a stop payment at the bank for ACH withdrawals.  Despite this, on February 26, 2010, an additional ACH deduction of $98.18 was made from Plaintiff's bank account.  On March 8, 2010, Ms. Schomaker closed her bank account and opened a new account.  Notwithstanding this, on April 2, 2010, TMG made an ACH deduction of $5.00 from Plaintiff's new account.

90.     On April 17, 2010, Ms. Schomaker's husband called TMG after-hours and was told that the account was "closed."  On April 19, 2010, Ms. Schomaker's husband contacted her bank to stop all ACH withdrawals on the new account.  At this point, LFG had deducted $249.54 and TMG had deducted $35.30.  Ms. Schoemacher still believed these two entities were one-and-the-same.

91.     TMG made multiple ACH deductions from Ms. Schomacher's bank account between October 2009 and April 2010, even though she  never used the credit card service beyond her early "test" transactions.

92.     Ms. Schomacher first became aware of LFG's purported separate existence when she received correspondence, dated April 5, 2010, directly from LFG and asserting a balance due of $150.78.  Ms. Schoemacher had never signed any agreement with LFG and believed that she had signed a service agreement only with TMG.

93.     On May 29, 2010, Ms. Schomaker officially opened her business to the public.  She never used the credit card services or machine for a business transaction.  Upon receipt of additional statements over the following month she came to learn that LFG was a separate entity billing her separately.

94.    Ms. Schomaker received LFG Invoice #5469484, dated May 5, 2010, claiming a balance due of $205.87.  She received correspondence asserting "past due" amounts of $156.78, $156.78, and $211.87 dated May 7, May 24, and June 1, 2010, respectively.

95.    Schomaker received LFG Invoice #5545142, dated June 3, 2010, claiming a balance due of $260.96.  She received correspondence asserting "past due" amounts of $211.87, $163.38, and $266.96 dated June 15, June 16, and June 30, 2010, respectively.

96.    Schomaker received LFG Invoice #5621914, dated July 8, 2010, claiming a balance due of $316.05.  She received correspondence asserting "past due" amounts of $266.96 dated July 15, 2010.

97.    Schomaker received LFG Invoice #5697248, dated August 5, 2010, claiming a balance due of $371.14.

98.    Schomaker received LFG Invoice #5771802, dated September 3, 2010, claiming a balance due of $426.23.

99.    Schomaker received correspondence with a "Demand for Payment" dated October 1, 2010.  The demand stated that Schomaker owed an outstanding balance due of $3,112.00.

100.    Schomaker received correspondence with a "Final Notice" dated October 12, 2010.  The notice stated that Schomaker owed an outstanding balance due of $3,112.00.

101.    On or about October 13, 2010, Schomaker received a copy of a Verified Complaint filed against her by Lease Finance Group, LLC in the Civil Court of the City of New York by attorney Joseph I. Sussman, P.C.  Attorney Sussman's correspondence indicated that his office is at 132 West 31st Street, New York, New York – the same address used by the Lease Finance Defendants.

102.   Prior to this time, Ms. Schoemacher never had seen a copy of any agreement purportedly entered into between herself and LFG.   The copy of the purported agreement between Ms. Schomaker and LFG, forwarded by attorney Sussman, was not a document or agreement Schomaker had executed or entered into.   Again, Schomaker never understood that she was making any agreement with LFG.   Further, the purported lease contained terms, as described above, which were onerous and one-sided,  to which Schomaker had not agreed and did not agree, of which Schomaker had not been apprised, and to which she would not have agreed had she been apprised.

103.   Attorney   Sussman   subsequently   commenced   the   lawsuit   against   Ms. Schoemacher in the New Yort City Civil Court, New York County.  That action has been stayed by consent of counsel.

**Other Similar Complaints Nationwide**

104.   The Better Business Bureau of Chicago/Northern Illinois reports 741 complaints against LFG on its website with the following entry:

> "Consumer complaints allege misrepresented and objectionable sales practices, and/or unauthorized charges and debits from consumers' bank accounts, and/or lack of notification of end of contract and subsequent renewal and billing. Further complaints allege technical problems with the credit card processing equipment provided by Lease Finance, and difficulties in either obtaining help from the company or returning the equipment in a timely fashion. The company deems that returning its own equipment does not relieve consumers from their payment obligations per the lease agreement, despite the fact that the consumers may no longer have any equipment and/or receive any services. Additional complaints allege that the three day right of rescission and timely termination of contract have not been honored. Other allegations cite poor customer service, being hung up on by company representatives, the company pursuing allegedly unwarranted collection actions and contacting credit report agencies despite consumers' continuous attempts to provide documentation to support their cases. Upon

28

sending requested documentation to Lease Finance, multiple consumers allege that the company declines receiving it and/or claims it was sent to the wrong location. Additional consumers allege to have never signed contracts with the company and question where the alleged signatures baring their names came from."

105. A review of internet consumer sites reveals numerous similar complaints.

## Class Allegations

106. Plaintiffs bring this action against Defendants on behalf of themselves and all others similarly situated. The Class is defined as follows:

All persons (including natural persons, corporations, partnerships, or other legal entities) who, from August 11, 2004 to the present, applied or contracted for merchant card services and/or related equipment leasing with any of the Defendants.

Such persons shall be referred to as "Class Members" or "class members."

107. This action has been brought and may properly be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

108. **Numerosity:** Plaintiffs do not know the exact size of the class, but it is estimated that it is composed of more than 100 persons. The persons in the class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

109. **Common Questions Predominate:** This action involves common questions of law and fact to the potential class because each class member's claim derives from the same set of deceptive, unlawful and/or unfair statements and omissions. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will

establish the right of each member of the class to recover. Among the questions of law and fact common to the class are:

    a.  Whether Defendants engage in activity designed to defraud the Class;

    b.  Whether the contracts entered into by class members are enforceable and/or unconscionable;

    c.  Whether Defendants unfairly, unlawfully and/or deceptively failed to provide class members all pages of operative agreements;

    d.  Whether Defendants unfairly, unlawfully and/or deceptively failed to inform class members of the exorbitant rates for leasing equipment;

    e.  Whether Defendants' advertising and marketing materials regarding their merchant card services and/or equipment that they sold or leased were likely to deceive Class Members or was unfair;

    f.  Whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

    g.  The amount of revenues and profits Defendants received and/or the amount of monies or other obligations lost by Class Members as a result of such wrongdoing;

    h.  Whether Class Members are entitled to declaratory, injunctive and other equitable relief and, if so, what is the nature of such relief;

    i.  Whether Class Members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief; and

    j.  Whether Class members are entitled to disgorgement and/or restitution.

110.   **Typicality:** Plaintiffs claims are typical of the class because Plaintiffs completed applications and/or entered into contracts with Defendants and their agents that are identical or nearly identical to the standard form contract used by Defendants and their agents. Thus, Plaintiffs and Class Members sustained the same injuries and damages arising out of Defendants' conduct in violation of the law. The injuries and damages of each Class Member were caused directly by Defendants' wrongful conduct in violation of law as alleged;

111.   **Adequacy:** Plaintiffs will fairly and adequately protect the interests of all Class Members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests that are in conflict with or antagonistic to the interests of Class Members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the class. No conflict of interest exists between Plaintiffs and Class Members hereby, because all questions of law and fact regarding liability of Defendants are common to Class Members and predominate over any individual issues that may exist, such, that by prevailing on their own claims, Plaintiffs necessarily will establish Defendants' liability to all Class Members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class Members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class Members.

112.   **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for the Defendants and result in the impairment of Class Members' rights and the disposition of their interests through actions to

31

which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions world engender. Furthermore, as the damages suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

## Claims For Relief

### First Claim For Relief

Consumer Fraud

113.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

114.    Defendants have engaged in deceptive acts or practices in violation of Ohio R.C. § 1345.01 *et seq.* wrongfully taking fees and other charges from Plaintiffs' and class members' bank accounts and charging Plaintiffs and class members exorbitant and unconscionable rates for leasing of credit card processing equipment.  Plaintiffs also seek remedies for Defendants' failure to adequately notify customers of this practice.

115.    Defendants have engaged and continue to engage in unfair, unlawful, and deceptive trade practices in California by engaging in the unfair, deceptive, and unlawful business practices outlined in this Complaint, in violation of Section 17200 *et seq.* of the California Business & Professions Code.  In particular, Defendants have engaged and continue to engage in unfair, unlawful, and deceptive trade practices including, but not limited to, the following:

a.   Altering contracts after they were signed;

32

b. Failing properly to inform class members that (1) they would be leasing the credit card processing equipment at rates much higher than this equipment could otherwise be purchased for; (2) they would be charged extremely high, undisclosed rates for the processing of credit card payments; (3) the lease and contract terms were for three or more years; (4) they would be subject to early termination fees; (5) they could be sued in foreign forums; and (6) Defendants would hold them personally liable;

c. Deceiving class members into believing that (1) the equipment finance lease agreements they entered into contained all applicable terms and conditions; (2) the merchant services application contained all applicable terms and conditions; (3) class members would be charged low, competitive rates for credit card processing services as set forth on rate sheets; (4) the agreements could be terminated at any time by all parties; and (5) terminals available for purchase or lease elsewhere were obsolete, becoming obsolete, or otherwise not compatible with Defendants' services;

d. Marketing, advertising, and selling credit card processing services and equipment leasing without disclosing to customers the true costs of such services;

e. Failing properly to inform their customers of the complete and accurate contract terms;

f. Engaging in false advertising in violation of Bus. & Prof. Code § 17500 *et seq.*;

g. Acting in breach of contract;

h. Acting in breach of the duty of good faith and fair dealing;

i. Engaging in conversion.

116.   Plaintiffs and the class members relied to their detriment on Defendants' unfair, deceptive, and unlawful business practices.   Had Plaintiffs and the class members been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, contracting with different merchant card services providers.

117.   Defendants' acts and omissions are likely to deceive the general public.

118.   Defendants engage in these unfair practices in order to increase their profits. Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by Section 17200 *et seq.* of the California Business & Professions Code.

119.   The aforementioned practices, which Defendants have used and continue to use to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

120.   Plaintiffs seek, on their own behalf and on behalf of the Class Members, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiffs, the general public, or Class Members by means of the unfair and/or deceptive trade practices complained of herein, plus interest thereon.

121.   Plaintiffs seek, on their own behalf and on behalf of the Class Members, an injunction to prohibit Defendants from continuing to engage in the unfair trade practices complained of herein.   The acts complained of herein occurred, at least in part, within the four years preceding the filing of this Complaint.

122.   Plaintiffs and Class Members are further entitled to and seek both a declaration that the above-described trade practices are unfair, unlawful and/or fraudulent and injunctive relief restraining Defendants from engaging in any such deceptive, unfair and/or unlawful trade practices in the future.   Such misconduct by Defendants, unless and until enjoined and restrained

by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that the Defendants will continue to violate the laws of the State of California, unless specifically ordered to comply with the same.  This expectation of future violations will require current and future customers repeatedly and continually to seek legal redress in order to recover monies paid to Defendants to which Defendants are not entitled. Plaintiffs and Class Members have no other adequate remedy at law to ensure future compliance with the California Business & Professions Code alleged to have been violated herein.

123.    Defendants have engaged in deceptive acts or practices in violation of [Oklahoma Consumer Protection Act 15 O.S. Supp. 1991 secs. 751 et seq.] wrongfully taking fees and other charges from Plaintiffs' and class members' bank accounts and charging Plaintiffs and class members exorbitant and unconscionable rates for leasing of credit card processing equipment. Plaintiffs also seek remedies for Defendants' failure to adequately notify customers of this practice.

124.    Defendants engaged in consumer oriented activity that did harm to the public interest and the public at large that was directed to consumers like Plaintiffs and which affected similarly situated consumers.  Class Members were treated like customers of the individual ISOs and banks, and their personal accounts were debited accordingly.

125.    Defendants furthermore engaged in this unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed as follows.

    a.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471 et seq.

b. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. §§ 44-1522 et seq.

c. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, et seq.

d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices or has made false representations in violation of Colo. Rev. Stat. § 6-1-105, et seq.

e. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, et seq.

f. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, et seq.

g. Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code § 28-3901, et seq.

h. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, et seq.

i. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Stat. §10-1-392, et seq.

j. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, et seq.

k. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, et seq.

l.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 50511, et seq.

m.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5.1, et seq.

n.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code § 714.1 b, et seq.

o.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, et seq.

p.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. § 367.110, et seq.

q.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. § 51:1401, et seq.

r.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation Mass Gen L. Ch. 93 A, et seq.

s.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, et seq.

t.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, et seq.

u.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 8.31, et seq.

v.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Missouri Stat. § 407.010, et seq.

w. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30-14-101, et seq.

x. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, et seq.

y. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, et seq.

z. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:l, et seq.

aa. Defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of N.J. Rev. Stat. § 56:8-1, et seq.

bb. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. § 57-12-1, et seq.

cc. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, et seq.

dd. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, et seq.

ee. Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of Okla. Stat. 15 § 751, et seq.

ff. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, et seq.

gg. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, et seq.

hh. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, et seq.

ii.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, et seq.

jj.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. code Laws § 37-24-1, et seq.

kk. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, et seq.

ll.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, et seq.

mm.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code. § 13-11-1, et seq.

nn. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. § 2451, et seq.

oo. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, et seq.

pp. Defendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of Wash. Rev. Code. § 19.86.010, et seq.

qq. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Virginia Code § 46A-6-101, et seq.

126.  The unfair and deceptive acts and practices of Defendants have directly, foreseeably, and proximately caused or will cause damages and injury to Plaintiffs and the members of the Class.

127.    The actions and failures to act of Defendant, and the above described course of fraudulent conduct and fraudulent concealment, constitute acts, uses, or employment by Defendant of unconscionable commercial practices, deception, fraud, false pretenses, misrepresentations, and the knowing concealment, suppression or omission of material facts with the intent that others rely upon such concealment, suppression, or omission of material facts in connection with the sale and or/leasing of merchandise of Defendant in violation of the consumer protection statutes listed above

128.    Plaintiffs and class members relied upon Defendants' misrepresentations and omission in applying for and entering into equipment lease contracts and by reason of the unlawful acts engaged in by Defendant, Plaintiffs and the Class have suffered ascertainable loss and damages.

129.    Plaintiffs and all others similarly situated were injured by Defendants' deceptive acts because they unknowingly were charged and improperly assessed fees to their bank accounts that they would otherwise not have incurred.

130.    As a direct and proximate result of the actions described above, Plaintiffs and Class Members have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive, unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.  Among other things, Plaintiffs and Class Members lost (1) the portion of the amount they paid for leasing the equipment at rates higher than the cost of purchasing the equipment; (2) the portion of the amounts paid for credit card processing services that was higher than what appeared on the first page of the lease agreements; and (3) undisclosed "LDW" fees; (4) the portion of any tax and filing fees which exceeded actual and legitimate

obligations or outlays for those purposes, if any; (5) termination fees that they were required to pay in order to get out of onerous contracts with Defendants.

131.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs and the Class were damaged, and are entitled to compensatory damages, punitive damages, attorneys' fees and costs of suit, in an amount to be proved at trial.

### Second Claim for Relief

False Advertising in Violation of California Business & Professions Code § 17500 *et seq.*

132.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

133.    Beginning at an exact date unknown to Plaintiffs, but within the three years immediately preceding the filing of this Complaint, Defendants have made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of their merchant card services and equipment leases throughout the State of California.

134.    Defendants have made misrepresentations and statements (by omission and commission) that lead reasonable customers to enter into agreements with Defendants and their agents. ISO Defendants made these statements acting on their own behalf, and as agents of Leasing Defendants. Specifically, Defendants Moore, Merchant Services Inc., and Universal, acting on behalf of themselves, devised a marketing strategy designed to mislead Class Members into believing that the ISO Defendants were agents of reputable banks, would offer them wholesale processing rates, and could save them substantial amounts of money on their card processing costs. Acting on behalf of themselves, ISO Defendants, and as agents for Leasing Defendants, Defendants Moore, Merchant Services Inc., and Universal devised a strategy to mislead Class Members into believing that ISO Defendants would be directly servicing their

equipment lease, that they could cancel the lease at any time, and that leasing equipment was a good value.

135.     Defendant Universal is alter-ego of Merchant Services Inc.

136.     Leasing Defendants authorized and directed ISO Defendants to make these misrepresentations, and doing so was within the scope of the authority granted by Leasing Defendants.

137.     These representations, statements, and omissions induced reasonable customers to lease equipment from Defendants and/or their agents.  These representations, statements, and omissions also induced reasonable consumers to agree to a complex and expensive schedule of fees for the services of Defendants and their agents to process credit card payments.

138.     Defendants' acts and omissions are likely to deceive the general public.

139.     Defendants engaged in these false, misleading, and deceptive advertising and marketing practices to increase their profits.  Accordingly, Defendants have engaged in false advertising, as defined and prohibited by Section 17500 *et seq.* of the California Business & Professions Code.

140.     The aforementioned practices, which Defendants have used and continue to use to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

141.     Plaintiffs seek, on behalf of Class Members, an injunction to prohibit Defendants from continuing to engage in the false, misleading, and deceptive advertising and marketing practices complained of herein.  The acts complained of herein occurred, at least in part, within the three years preceding the filing of this Complaint.

42

142.     Plaintiffs and Class Members are further entitled to and do seek both a declaration that the above-described practices constitute false, misleading, and deceptive advertising, and injunctive relief restraining Defendants from engaging in any such advertising and marketing practices in the future.  Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that the Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same.  This expectation of future violations will require current and future customers repeatedly and continually to seek legal redress in order to recover monies paid to Defendants to which Defendants are not entitled.  Plaintiffs, Class Members, and/or other consumers in California have no other adequate remedy at law to ensure future compliance with the California Business & Professions Code alleged to have been violated herein.

143.     As a direct and proximate result of such actions, Plaintiffs and Class Members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.  Among other things, Plaintiffs and Class Members lost (1) the portion of the amount they paid for leasing the equipment at rates higher than the cost of purchasing the equipment; (2) the portion of the amounts paid for credit card processing services that was higher than what appeared on the first page of the lease agreements; and (3) undisclosed "LDW" fees; (4) the portion of any tax and filing fees which exceeded actual and legitimate obligations or outlays for those purposes, if any; (5) termination fees that they were required to pay in order to get out of onerous contracts with Defendants.

144.   As a direct and proximate result of such actions, Defendants have enjoyed and continue to enjoy significant financial gain in an amount which will be proven at trial.

### Fourth Claim For Relief

Common Law Fraud

145.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

146.   Defendants made misrepresentations and omissions of facts material to Plaintiffs' and Class members' decisions to apply for and lease credit card processing equipment as set forth in detail above by actively concealing, and causing others to conceal, true information about the nature and implications of the application and contracts for the equipment and by not revealing to Plaintiffs and class members the entirety of the contracts.

147.   Defendants knew at the time that they made these misrepresentations and omissions that they were false or that Defendants had failed to disclose facts they were obligated to disclose in order to make their other representations not misleading. Defendants were aware that Plaintiffs and class members would rely on these misrepresentations and omissions, and that such representations were material in the Plaintiffs' and class members' decisions to apply for and enter into equipment lease contracts with Defendants.

148.   Plaintiffs and the Class reasonably relied upon Defendants' misrepresentations and omissions of material fact. Plaintiffs and the Class had no reason to doubt the veracity or validity of the information Defendants promoted through their marketing and sales strategies.

149.   Defendants' misrepresentations and omissions of material fact directly and proximately caused Plaintiffs' and the Class's damages.

150.    By virtue of the fraud they perpetrated on Plaintiffs and the Class, Defendants are liable to Plaintiffs and the Class for all damages Plaintiffs and the Class have sustained, plus punitive damages, plus the cost of this suit, including attorney's fees.

### Fifth Claim For Relief

Unjust Enrichment

151.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

152.    As an intended and expected result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from payments Plaintiffs and the Class made for equipment leases.

153.    In exchange for the payments they made for the leases, and at the time they made these payments, Plaintiffs and the Class expected that the equipment lease contracts were disclosed in full, that they would pay reasonable rates, and that Defendants had provided all of the necessary and accurate information and disclosed all of the lease contract's terms.

154.    Defendants have voluntarily accepted and retained these payments with full knowledge and awareness that, as a result of their wrongdoing, Plaintiffs and the Class paid exorbitant and unconscionable rates and fees for equipment leases when they otherwise would not have done so. The failure of Defendant to provide Plaintiffs and the Class with the remuneration they expected enriched Defendant unjustly.

155.    Plaintiffs and the Class are entitled in equity to seek restitution of Defendants' wrongful profits, revenues and benefits to the extent and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy Defendants' unjust enrichment.

## Sixth Claim For Relief

### Deceit, Fraud and/or Misrepresentation

156.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

157.    The misrepresentations, nondisclosure and/or concealment of material facts made by Defendants to Plaintiffs and the members of the Class, as set forth above, were known by Defendants to be false and material and were intended by the Defendants to mislead Plaintiffs and the members of the Class.

158.    Plaintiffs and the Class were actually misled and deceived and were induced by Defendants to incur charges and fees they otherwise would not have incurred.

159.    As a result of the conduct of Defendants, Plaintiffs and the class members have been damaged by having incurred unwarranted fees and charges taken from their bank accounts.

160.    By reason of the foregoing, Defendants are liable to Plaintiffs and the class members for deceit, fraud, and/or misrepresentation in an amount to be proved at trial.

## Seventh Claim For Relief

### Negligent Misrepresentation

161.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

162.    Defendants had a duty to provide honest and accurate information to Plaintiffs and class members to prevent them from incurring exorbitant, fraudulent and unconscionable fees and charges associated with equipment leases.

163.    Defendants specifically and expressly indicated to Class Members that the application for a "free trial" for credit card processing equipment and the amount they would be charged for 'terminal fees" was true and reliable, and that the lease contracts that Plaintiffs and

class members agreed to were complete and included all terms, when in fact these representations were inaccurate and unreliable.

164.   Such misrepresentations were and are made by Defendants through the use of terms like "free trial" and "terminal fees", when in fact such representations were not what they purport to be, and the various marketing materials and the contracts foisted on Plaintiffs and class members by Defendants were also misleading and false.

165.   Defendants knew or in the exercise of reasonable diligence should have known, that the ordinary consumer and customer of Defendants' products would understand Defendants' representations concerning the term "free trial" as being what it purported it to be -- "free" -- and that the "terminal fees" charged would be precisely what was represented they would be. Defendants also knew, or in the exercise of reasonable diligence should have known, that the ordinary consumer and customer of Defendants' products would understand and believe these various representations as accurate and reliable and that any other understanding on the part of consumers would not be reasonable given Defendants' representations.

166.   Plaintiffs and class members justifiably relied on Defendants' misrepresentations and made applications for and entered into lease contracts for credit card processing equipment, and were subsequently charged exorbitant rates and fees.

167.   As a result of the conduct of Defendants, Plaintiffs and class members have been damaged by having relied on Defendants' misrepresentations with regard to the equipment lease contracts.

168.   By reason of the foregoing, Defendants are liable to Plaintiffs and the class members for negligent misrepresentation in an amount to be proved at trial.

### Seventh Claim For Relief

Conversion

169.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

170.    Plaintiffs and the Class members own and have the right to possess the money that is in their bank accounts.

171.    Defendants interfered with Plaintiffs' and the Class members' possession of this money by wrongfully taking directly from their bank accounts fees and charges associated with leases of credit card processing equipment from Defendants despite the fact that Plaintiffs and class members had never authorized such deductions at the rates and fees charged. Plaintiffs and the Class members never consented to Defendants taking such fees and charges from their bank accounts.

172.    Plaintiffs and the Class members have been damaged by Defendants' wrongful taking of such fees and charges from their bank accounts in an amount that is capable of identification through Defendants' records.

173.    By reason of the foregoing, Defendants are liable to Plaintiffs and the class members for conversion in an amount to be proved at trial.

### Eighth Claim For Relief

Breach of Contract

174.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

175.    Defendants engaged in a pattern and practice of charging and collecting sums in excess of those specified in the equipment lease and applications provided to Plaintiffs and class

members and by imposing different terms on the lease and contract than those promised and revealed to Plaintiffs and class members.

176.   In so doing, to the extent that Plaintiffs and the members of the Class entered into enforceable contracts with Defendants, Defendants breached those contracts. Defendants willfully and systematically concealed the terms of the contracts from Plaintiffs, the Class, and the general public, in a practice that is ongoing.

177.   Defendants further breached the covenant of good faith and fair dealing implied in every contract.

178.   Plaintiffs and the Class members have been damaged by Defendants' breach of contract as described herein.

179.   By reason of the foregoing, Defendants are liable to Plaintiffs and the class members for breach of contract in an amount to be proved at trial.

## Prayer For Relief

Wherefore, Plaintiffs, on their own behalf and on behalf of the Class, pray for relief as follows:

A.   certifying the Class and appointing Plaintiffs and their counsel to represent the Class;

B.   awarding Plaintiffs and the Class compensatory damages and restitution and/or disgorgement and other equitable relief as the Court deems proper;

C.   enjoining Defendants from engaging in the wrongful practices described herein;

D.   awarding Plaintiffs and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' and expert-witness fees and other costs as may be deemed applicable; and

E.   awarding such other and further relief as this Court may deem just and proper.

## Demand For Jury Trial

Plaintiffs, and all others similarly situated, hereby demand a trial by jury of all claims so triable herein.

Dated: November 10, 2011

<div style="margin-left:40%">

Respectfully submitted,

Chittur & Associates, P.C.

By: Krishnan S. Chittur, Esq.
286 Madison Avenue
New York, New York 10017
Tel: (212) 370-0447

Hanly Conroy Bierstein Sheridan
  Fisher & Hayes LLP

By:
Mitchell M. Breit
mbreit@hanlyconroy.com
Andrea Bierstein
abierstein@hanlyconroy.com
112 Madison Avenue
New York, NY 10016-7416
Telephone:  (212) 784.6400
Facsimile:  (212) 213-5949

Hunter J. Shkolnik
hunter@napolibern.com
Napoli Bern Ripka & Shkolnik
350 Fifth Avenue
New York, NY 10118
Telephone:  (212) 267-3700

Attorneys for Plaintiffs and the Proposed Class

</div>

*Of Counsel*
Richard J. Arsenault
rarsenault@nbalawfirm.com
Neblett Beard & Arsenault
2220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana 71309
Telephone: (800) 256-1050

Derek Y. Brandt
dbrandt@simmonsfirm.com
Simmons, Browder, Gianaris, Angelides, & Barnerd, LLC
One Court Street
Alton, IL 62002
Tel. (618) 259-2222
Fax (618) 259-2251